17 MAG. 6558

Approved: _____
ANDREW CHAN / JILAN KAMAL / ANDREW THOMAS
Assistant United States Attorneys

Before:   HONORABLE KEVIN NATHANIEL FOX
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - X
                            :   COMPLAINT
UNITED STATES OF AMERICA    :
                            :   Violation of 21 U.S.C.
        - v. -              :   § 846
                            :
TONY McCLAM and             :   COUNTY OF OFFENSE:
RAYMUNDO LEAL,              :   BRONX
                            :
        Defendants.         :
- - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

       SARAH CARDONA, being duly sworn, deposes and says that he is a Special Agent with the Drug Enforcement Administration ("DEA"), and charges as follows:

### COUNT ONE

       1.  In or about May 2017, in the Southern District of New York and elsewhere, TONY McCLAM and RAYMUNDO LEAL, the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

       2.  It was a part and an object of the conspiracy that TONY McCLAM and RAYMUNDO LEAL, the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

3. The controlled substance that TONY McCLAM and RAYMUNDO LEAL, the defendants, conspired to distribute and possess with intent to distribute was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

The bases for my knowledge and the foregoing charge are, in part, as follows:

4. I am a Special Agent with the DEA. I have been personally involved in the investigation of this matter. This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

5. Since in or about February 2015, the DEA has been conducting an investigation of a California and Mexico-based drug trafficking organization ("DTO") that uses commercial trucks to transport narcotics to and from various locations within the United States. From my participation in the investigation and my conversations with other DEA agents, I have learned, in substance and in part, that, members of the DTO routinely transport narcotics from Mexico to California via truck drivers who work for commercial trucking companies. These truck drivers typically deliver parcels of bulk narcotics to local personnel for local distribution.

6. During the course of the investigation, other agents and I arrested a truck driver ("CW-1") who had delivered narcotics from the DTO to individuals in the New York City area. Following CW-1's arrest, CW-1, who has since pleaded guilty to his participation in the DTO, agreed to assist law enforcement in hopes of receiving leniency at sentencing.[1]

---

[1] CW-1 has proven reliable in the past. Information provided by CW-1 has been corroborated, in part, by consensual recordings,

7. Based on conversations with CW-1, a review of recordings created by CW-1 at the direction of the DEA, and a review of telephone calls to and from CW-1 that were intercepted with CW-1's consent, I have learned, in part, the following:

a. On or about May 18, 2017, an individual ("CC-1") contacted CW-1 by telephone. During that call, which was not recorded, CC-1 informed CW-1, in substance and in part, that CC-1 and another person ("CC-2") had procured a wholesale shipment narcotics and wanted to meet CW-1 to discuss shipping those narcotics to the New York City area.

b. On or about May 27, 2017, CC-2 contacted CW-1 by telephone. During that call, which was not recorded, CC-2, in substance and in part, (a) directed CW-1 to coordinate the retrieval of a parcel of narcotics from an associate ("CC-3"), (b) informed CW-1 that CC-2 intended to pick-up the narcotics in New York himself, and (c) said that the narcotics were intended for sale to an individual in New York.

c. On or about May 28, 2017, at the direction of law enforcement, CW-1 met CC-3 at a travel stop in the Bakersfield, California area. At CC-3's direction, CW-1 retrieved a bag from the back seat of CC-3's vehicle. The bag contained approximately 14 individually-wrapped packages (the "Drug Shipment").

d. CW-1 subsequently provided the Drug Shipment to the DEA.

8. Based on an inspection of the Drug Shipment and a review of laboratory tests of the Drug Shipment's contents, I know that the Drug Shipment contained approximately 14 kilograms of cocaine divided into 14 individually-wrapped bricks.

9. Based on conversations with CW-1, a review of recordings created by CW-1, a review of call detail records, visual surveillance, and conversations with other law enforcement agents participating in the investigation, I have learned, in part, the following:

a. On or about May 31, 2017, CW-1 exchanged a series of telephone calls with CC-2 to coordinate the delivery

---

call detail records, visual surveillance, Title III interceptions, and seizures.

of the Drug Shipment. CC-2 used a cellphone with a particular call number (the "Leal Phone"). The DEA intercepted and recorded these communications with CW-1's consent. During these calls, in substance and in part, CC-2 and CW-1 apprised each other of their of respective progress in reaching a pre-arranged meeting point at a particular highway rest area near Ridgefield, New Jersey (the "Truck Stop").

   b. At approximately 8:00 p.m. on May 31, 2017, another agent and I provided CW-1 with a suitcase filled with approximately nineteen individually-wrapped brick-shaped parcels that contained a powder resembling cocaine (the "Suitcase").

   c. After providing CW-1 with the Suitcase, other law enforcement agents and I conducted visual surveillance at the Truck Stop.

   d. At approximately 10:05 p.m., a white Volkswagen Touareg (the "SUV") pulled into the Truck Stop. The SUV parked near CW-1's truck. CW-1 brought the Suitcase over to the SUV. The SUV's rear passenger door opened and CW-1 placed the Suitcase inside. The SUV drove away from the Truck Stop.

   e. At approximately 10:15 p.m., law enforcement agents, who had been following the SUV, activated emergency lights and sirens. The SUV then pulled to the side of the roadway.

   f. After approaching the SUV, a DEA agent ("Agent-1") observed three individuals seated inside the SUV: TONY McCLAM and RAYMUNDO LEAL, the defendants, and a third person (the "Driver"). The Driver was seated behind the wheel, McCLAM was seated in the front passenger seat, and LEAL was seated in a rear passenger seat. After engaging LEAL in conversation, Agent-1 directed the occupants to step out of the SUV.

   g. McCLAM, in substance and in part, informed Agent-1 that he owned the SUV. McCLAM gave verbal consent to Agent-1 to search the SUV. Agent-1 looked inside the SUV, found the Suitcase in the trunk, and retrieved the Suitcase. Agent-1 asked McCLAM, LEAL, and the Driver about the Suitcase, but each person denied owning the Suitcase or having seen it before.

   h. Agent-1 placed McCLAM, LEAL, and the Driver under arrest. In connection with the arrests of McCLAM and LEAL, law enforcement agent seized multiple cellular telephones from each man. Based on telephone service provider records and

location data on the Leal Phone, I know that one of the cellular phones possessed by LEAL was the same make and model as the Leal Phone, and was located at the same approximate place as the Leal Phone.

        i. After transporting TONY McCLAM and RAYMUNDO LEAL, the defendants, and the Driver, to a safe location away from the roadside, Agent-1 advised McCLAM of his *Miranda* rights. Based on conversations with Agent-1, and a review of DEA records, I know that McCLAM, at first, and in substance and in part, (a) acknowledged ownership of the car, (b) denied having seen the Suitcase before, and (c) claimed to have been sleeping while at the Truck Stop. Later, after Agent-1 spoke with LEAL and the Driver, Agent-1 confronted McCLAM again. McCLAM then said, in substance and in part, (a) LEAL had traveled to the Truck Stop to meet someone, (b) LEAL had picked-up a bag from a truck driver, and (c) LEAL had recently arrived in New York from California.

        j.   At approximately 11:15 p.m., a certified narcotics detection canine handler ("Officer-1") exposed the exterior and the interior of the SUV to his trained canine, "Cedo," for inspection and review.[2] Cedo reacted to the interior of the SUV, specifically, to, among other places, an area in the

---

[2]   I am informed by Cedo's handler, Officer-1, that Cedo is a German Shepherd, originally certified as a narcotics detection canine after completing certification with the Port Authority Police Academy and the U.S. Police Canine Association in July 2008. Cedo was certified to detect the odors of marijuana, cocaine, heroin, ecstasy, methamphetamines, and their derivatives. Since that time, Cedo has received numerous hours of training and is utilized regularly for the purpose of detecting narcotic odors. Cedo has been involved in hundreds of search warrants and has made numerous positive identifications. During Cedo's training and in order to be certified, he is subjected to numerous objects both containing and not containing narcotics. He is trained to differentiate and to give a positive indication if he detects the odors of narcotics. Cedo was last certified in June 2016. He is routinely used to conduct searches of automobiles, residences, packages and suitcases. Cedo alerts after detecting the scent of narcotics. Cedo will positively alert his handler to the presence of the odor of marijuana, cocaine, heroin, ecstasy, and methamphetamine and their derivatives. He has successfully given positive indications of narcotics in the field in the past and has proven reliable in the field.

trunk. Law enforcement subsequently searched the truck and discovered a hidden compartment, which was empty. Agent-1 then asked TONY McCLAM, the defendant, about the compartment; McCLAM, in substance and in part, said that he was unaware of the compartment and had purchased the car from RAYMUNDO LEAL, the defendant, and LEAL's associates.

10. Based on cellphone geolocation data on the Leal Phone, I know that the Leal Phone traveled through Bronx, New York before arriving at the Truck Stop. Based on the facts that (a) CC-2 had told CW-1 that CC-2 intended to retrieve the Drug Shipment himself, (b) CW-1 spoke to a person using the Leal Phone shortly before delivering the Suitcase, and (c) LEAL had possession of a cellphone of make, model, and location of the Leal Phone, I believe that CC-2 is, in fact, RAYMUNDO LEAL, the defendant.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of TONY McCLAM and RAYMUNDO LEAL, the defendants, and that they be arrested and imprisoned or bailed, as the case may be.

_____
Special Agent Sarah Cardona
Drug Enforcement Administration

Sworn to before me this
29th day of August, 2017.

_____
THE HONORABLE KEVIN NATHANIEL FOX
United States Magistrate Judge
Southern District of New York

6